<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| HORIZON HEALTHCARE SERVICES, INC., | : | |
| Plaintiff, | : | Civil Action No.  03-4098 (JAG) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ALLIED NATIONAL, INC., AMERICAN INTERNATIONAL GROUP, INC., THE UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF NEW YORK, and BROKERAGE MARKETING SERVICES CORPORATION, | : | |
| Defendants, | : | |
| and | : | |
| CELTIC INSURANCE COMPANY, | : | |
| Third-Party Defendant. | : | |

<u>GREENAWAY, JR., U.S.D.J.</u>

This matter comes before the Court on two Motions for Summary Judgment by Plaintiff Horizon Healthcare Services, Inc. ("HHS"), and a Cross-Motion for Summary Judgment by Defendant Allied National, Inc. ("Allied"), pursuant to FED. R. CIV. P. 56.  In its first motion, HHS seeks cancellation of federal service mark reg. no. 2,724,437, registered to Allied, on grounds of invalidity and fraud; in its second, HHS seeks a judgment of priority in the service mark "HORIZON."   Allied has cross-moved for a judgment of priority in the mark

1

"HORIZONS."  For the reasons set forth below, HHS' motions will be granted in part and denied in part, and Allied's cross-motion will be denied.

## INTRODUCTION

These motions arise in the context of a trademark dispute between HHS and Allied concerning use of the service marks "HORIZON" and "HORIZONS" in connection with the sale of health insurance plans.  In brief, Allied asserts that federal service mark registration no. 2,724,437 establishes its rights in the mark, while HHS claims to be owner of superior common law rights in the mark as assignee of Celtic Insurance Company.  HHS moved for summary judgment on three issues: 1) the validity of Allied's federal registration; 2) priority in the mark; and 3) infringement by American International Group, Inc. and United States Life Insurance Company.  Allied has cross-moved for summary judgment on the issue of priority.  The parties do not dispute that the three motions are interrelated, with overlapping issues.  This Opinion addresses the motions on the issues of the validity of Allied's federal registration, and priority in the mark.[1]

In 1996, Allied applied for registration of "HORIZONS" as a mark for "marketing, screening, and administration of group benefit plan services."  (Prosecution history of service mark reg. no. 2,724,437, Cenar Decl. Vol. III Ex. D at USPTO 0017.)  In the first office action, the U.S. Patent and Trademark Office ("PTO") issued a rejection because, inter alia, the "applicant must clarify the recitation of services by indicating the type of group benefit plan – e.g. insurance, retirement, annuities, etc."  (Id. at USTPO 0020.)  On January 2, 1998, Allied

---

[1]Because the issue of infringement relies on determination of validity and priority, the Court will address the motion for summary judgment of infringement following the issuance of this Opinion.

2

submitted an amendment in which it changed the recitation of services to "[m]arketing for the benefit of others, prequalification of insureds and administration of group insurance benefit plan services," explaining that, as the examiner required, it had identified the type of benefit plan.  (Id. at USTPO 0023.)  In the second office action of February 23, 1998, the examiner noted the amended recitation of services, but refused registration because of likelihood of confusion with marks already registered, including Allied's own "WELLNESS HORIZONS" mark, along with other problems.  The examiner noted that four insurance service marks included the word "Horizon," and connected the likelihood of confusion to the fact that all of the services related to life or health insurance.

On August 22, 1998, Allied filed an amendment with a much-changed indentification of services, referring to the insurance plans as "individual, pre-paid health care plans" instead of "group insurance benefit plan[s]."  (Id. at USTPO 0034.)  The PTO issued a notice of allowance on September 24, 2002.  (Id. at USPTO 0056.)  On January 16, 2003, Allied submitted a statement of use signed by David Ashley, President of Allied, on December 23, 2002.  (Id. at USPTO 0059-60.)  The statement of use was accompanied by two specimens of use, the "Horizons Fifty Plus" brochure and the "Horizons Temporary Health" brochure.  (Id. at USPTO 0006-14.)  The registration issued on June 10, 2003.

## ANALYSIS

### I.    Governing Legal Standards

#### A.    Standard for a Rule 56 Motion for Summary Judgment

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the

3

moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).  In making this determination, the Court must draw all reasonable inferences in favor of the non-movant.  Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994); Nat'l State Bank v. Fed. Reserve Bank of N.Y., 979 F.2d 1579, 1581 (3d Cir. 1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).  In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all

4

reasonable inferences – including on issues of credibility – in favor of the non-moving party. Watts v. Univ. of Del., 622 F.2d 47, 50 (3d Cir. 1980).

## II.     The Motion for Partial Summary Judgment on Validity of the Registration

HHS has moved for partial summary judgment on the issue of the validity of Allied's federal service mark registration, seeking cancellation.  HHS argues that the registration is invalid due to fraudulent procurement, and that it is void ab initio due to other defects in the application process.  HHS has demonstrated that, as to the issues of invalidity of the registration due to defects in the registration process, there are no genuine issues as to any material facts, and the evidence of invalidity of Allied's '437 registration entitles it to judgment as a matter of law.

### A.     Invalidity based on violation of 37 C.F.R. § 2.71

HHS argues that Allied's registration is void ab initio on a number of grounds.  First, HHS contends that it was obtained in violation of 37 C.F.R. § 2.71, which allows the applicant to amend the application to clarify or limit the identification of services, but not to expand it.  HHS proposes that the August 22, 1998 amendment impermissibly broadened the identification of services.  Allied responds that this amendment permissibly clarified the identification of services.

HHS points to the current 37 C.F.R. § 2.71(a), but this was put in force on September 8, 1999.  See Trademark Law Treaty Implementation Act Changes, 64 Fed. Reg. 48,900 (Sept. 8, 1999).  Essentially the same rule was in force, however, at the time of Allied's 1998 amendment: "The identification of goods or services may be amended to clarify or limit the identification, but additions will not be permitted."  See Amendments to Patent and Trademark Rules to Implement Trademark Law Revision Act, 54 Fed. Reg. 37,562 (Sept. 11, 1989) (formalizing this rule as 37 C.F.R. § 2.71(b)).  Like the current rule, the rule in force in 1998 allowed amendment only to

5

clarify or limit the identification of services.

Allied's earlier January 2, 1998 amendment provides an example of a permissible clarification under the rule.  At that point, responding to the examiner's request for clarification, Allied changed the identification from "administration of group benefit plan services" to "administration of group insurance benefit plan services."  This change clarified the description of services by limiting it to a specific type of benefit plan, a permissible narrowing of scope.

The August 22, 1998 amendment, however, neither clarified nor limited the identification.  Among the many changes made, "administration of group insurance benefit plan services" was changed to "administration of individual, pre-paid health care plans."  The change from group insurance plans to individual pre-paid health care plans did not limit or clarify, but rather impermissibly changed the scope altogether.  Individual and group insurance plans are distinct, mutually exclusive categories of services.[2]  A change from one distinct, mutually exclusive category to another cannot be a permissible limitation or clarification.

Allied argues that an "individual plan" here means "an individual employer's group plan," and so the amended scope is within the original scope.  (Dec. 1, 2005 Hearing Tr. 17.) This argument is wholly without merit.  First, it is inconsistent with the ordinary meaning of the words used.  At the time of the August 28, 1998 amendment, the current Trademark Manual of Examination Procedure ("TMEP") was the second edition, revision 1.1 of April 1997, which stated:

---

[2]HHS offered considerable evidence in support of this distinction.  In reply, Allied offered unconvincing argument which neither persuaded nor showed the existence of a genuine issue as to a material fact.  Most persuasive was the fact that Allied's website clearly distinguished individual from group insurance plans, treating them as distinct, mutually exclusive categories identified by the words "individual" and "group."  See http://www.alliednational.com.

> The major requirements for an identification of services to be acceptable are: (1)
> the identification must be definite; (2) it must use the common name or
> terminology for the services, so as to be readily understandable; (3) it must
> accurately describe the services rendered under the mark; and (4) it must specify
> services rendered under the mark, not just collateral or related activities associated
> with rendering the services.

TMEP (2nd ed., rev. 1.1) § 1301.05. Allied does not argue that "individual, pre-paid health care plans" is the common name for group plans marketed to employers. Rather, it argues for an interpretation of the words "group" and "individual" that is unpersuasive, idiosyncratic at best, and sometimes unreasonable and incredible.

Allied interprets "group" and "individual" in regard to insurance plans in a way that erases the distinction between the two: individual plans are group plans, and vice versa. Some of Allied's attempts at persuasion on this point at oral argument made no sense whatsoever. For example, Allied claimed that "an individual insurance policy for an individual is a form of group benefit." (Dec. 1, 2005 Hearing Tr. 18.) Also:

| | |
|---|---|
| The Court: | So you're telling me that when the term is used, "individual health care plan" . . . it does refer to an individual getting a prepaid health care plan, but it also refers to a group in which the insurance is sold . . . to an employer?" |
| Mr. Brown: | Yes, your honor, that's my point. |

(Id. 20.)

The illogic became most apparent when Allied was asked about their classification of products on their website, www.alliednational.com. Allied admitted that, on its website, insurance plans are classified into categories, some as group plans, and others as individual plans. Asked about whether this was consistent with Allied's position in this litigation, Mr. Brown replied, "[W]e would take the position that all of these insurance products . . . are all individual,

prepaid health care plans."  (Dec. 1, 2005 Hearing Tr. 31.)  For Allied to distinguish between the categories of group and individual plans on its website and then argue before the Court that the two categories are the same is manifestly unreasonable.

Moreover, even if Allied's management actually believed this, this position evidences recklessness about misleading both the PTO and the public: if maintained in good faith, Allied surely disregarded the common knowledge that, without explanation, others would understand "individual" to refer to individual insurance plans, not group plans.  Thus, Allied's argument is improbable, unreasonable and, if believed, evidences recklessness about misleading the PTO and public.

In its brief, Allied attempted to support its argument that groups plans are individual plans by pointing to the deposition testimony of its expert, Robert Amorde: "Mr. Amorde also testified that within the insurance industry individual plans with individual certificates are provided with group pricing and universal benefits.  Mr. Amorde further testified that Allied applies group pricing models to insureds who apply individually through small groups and receive individual plans."  (Def.'s Rule 56.1 Omni. Resp. ¶ 31.)

The deposition testimony of Mr. Amorde, however, does not support Allied's claim.  Mr. Amorde referred to small group insurance that Allied provides to employers, and described how, in these group plans, individual employees apply for insurance and qualify as individuals, and receive certificates of insurance individual to the employee.  Yet he did not agree that – as Allied contended at oral argument – group members have individual plans:

Q.     Would each employee within that group have his or her own individual plan?
A.     No.

(Haefner Cert. Ex. Q at 156:20-23.)  Amorde's testimony thus contradicts the claim that an individual in a group plan has what could be called an "individual plan."

In further support, Allied claims that Amorde said that Allied provides group pricing of individual plans, but this distorts what Amorde stated.  Amorde said that the industry has evolved such that it now offers "group pricing of individual plans."  (Id. at 159:10-12.)  This was not a statement about Allied, but about the industry as a general matter.  When questioned specifically about what Allied is doing, Amorde said, "Allied is applying the group pricing models that the insurance company has supplied to those individuals who apply through small groups."  (Id. at 166:10-17.)  This does not support the conclusion that such group plans are, in fact, individual plans.  Rather, Amorde chose his words carefully to observe the distinction between the two.

This Court concludes that Allied's arguments do not persuade that the August 22, 1998 amendment either clarified or limited the identification of services.  It was an impermissible change in the identification and in violation of 37 C.F.R. § 2.71(b), as in force in 1998.  The examiner should have refused registration.  This constitutes a valid ground for cancellation of the registration.

Section 37 of the Lanham Act empowers this Court to cancel trademark registrations: "In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, and otherwise rectify the register with respect to the registrations of any party to the action."  15 U.S.C. § 1119.  The Third Circuit has interpreted this broadly: district courts have jurisdiction "to cancel registered marks when the validity of the mark is called into question in a judicial proceeding."  Marshak v. Treadwell, 240 F.3d 184, 193 (3d Cir. 2001).

The Federal Circuit has articulated the elements necessary for an application for trademark cancellation. Although the Federal Circuit is not controlling authority for this Court in trademark matters, it does review decisions of the Trademark Trial and Appeal Board and its guidance is persuasive authority. The Federal Circuit standard is set out in <u>Cunningham v. Laser Golf Corp.</u>, 222 F.3d 943 (Fed. Cir. 2000):

> The party seeking cancellation must prove two elements: (1) that it has standing; and (2) that there are valid grounds for canceling the registration. . . Establishing the second element, a valid ground for cancellation, is simplified if the registered mark has been on the Principal Register for less than five years. . . In such a case, any ground that would have prevented registration in the first place qualifies as a valid ground for cancellation.

<u>Id.</u> at 945-946. Proof of standing "requires only that the party seeking cancellation believe that it is likely to be damaged by the registration." <u>Id.</u> at 945. HHS has established both that it believes that it is likely to be damaged by the registration, and that it has a valid ground for cancellation. Under 37 C.F.R. § 2.71, the examiner should have rejected Allied's August 22, 1998 amendment as impermissible, and the registration should not have issued. The violation of 37 C.F.R. § 2.71 should have prevented registration in the first place, and thus qualifies as a valid ground for cancellation.

      B.      <u>Invalidity based on violation of 15 U.S.C. § 1051</u>

HHS argues that Allied submitted a specimen of use, the "Horizons Fifty Plus" brochure (the "H50+"), which was not in actual use in commerce. While HHS argues that Allied's submission was fraudulent, this Court need not reach the issues of fraud, as the invalidity of the specimen constitutes sufficient ground for cancellation of the mark.

Allied does not dispute that the H50+ specimen was not in use in commerce at the time

10

the statement of use was signed on December 23, 2002.  It admits that the "Horizons Fifty Plus"

program was not one of Allied's insurance products at that time.  (Def.'s Omni. Br. Opp. 27.)

Nor does Allied dispute that David Ashley testified at deposition that Allied had discontinued the

"Horizons Fifty Plus" program in 2000.  (Cenar Decl. Vol. III Ex. G 112:3-13; Def.'s Rule 56.1

Omni. Resp. 16-17.)

 Allied submitted the H50+ brochure as a specimen of use of the mark for the Class 35

services, and the "Horizons Temporary Health" brochure (the "HTH") as a specimen of use of

the mark for the Class 36 services.  HHS argues that, because the H50+ specimen was not in

actual use, Allied submitted no specimen supporting Class 35.  In response, Allied contends that

the HTH brochure supports the identifications of service for both classes.  Allied is not

persuasive on this point.

 Under 37 C.F.R. § 2.56(b)(2), "[a] service mark specimen must show the mark as actually

used in the sale or advertising of the services."  Use of the mark in the act of rendering the

services has been held to satisfy this requirement.  In re Red Robin Enterprises, Inc., 222

U.S.P.Q. 911, 913 (T.T.A.B. 1984).  Services must be rendered "for others," which has been

interpreted to mean that others must receive some benefit for them.  In the registration, the Class

35 services are identified as: "cooperative marketing and advertising of individual, pre-paid

health care plans, excluding life insurance, for others."

 Courts have recognized that a special analysis applies to the use of promotional materials

as specimens of marks for advertising services.  The business purchaser of the advertising service

must be distinguished from the customer of that purchaser (to whom the advertising is directed.)

See, e.g., In re Caruso Property Mgmt., 2005 TTAB LEXIS 478 (T.T.A.B. Nov. 2, 2005).  It is

acceptable to use a promotional brochure as a specimen for an advertising service, but the mark must be used so as to identify the advertising service itself, not the product being advertised.

The Federal Circuit analyzed this issue in In re Advertising & Marketing Dev., Inc., 821 F.2d 614, 619 (Fed. Cir. 1987). For a promotional brochure to qualify as a specimen for advertising services: 1) "advertising services must be sufficiently separate from the subject of the advertising;" 2) the "mark must be used to identify advertising services, not merely to identify the subject of the advertising;" and 3) the specimen must "show a 'direct association' between the mark and the services named in the application." Id. The T.T.A.B. has interpreted the direct association test to require "that it be used in such a manner that it would be readily perceived as identifying such services." In re Moody's Investors Serv., Inc., 1989 TTAB LEXIS 53 (T.T.A.B. 1989).

The HTH brochure appears to be promotional material used to market Allied's "Horizons Temporary Health" health care insurance plan to consumers purchasing as individuals. It does not meet the requirements of the In re Advertising analysis. The HTH brochure does not evidence any separation between the advertising service and the subject of the advertising, the insurance plan. The Horizons mark is used only to identify the subject of the advertising, the insurance plan, and not advertising or marketing services. The specimen does not show any association between "Horizons" and advertising or marketing services. Following the inquiry of In re Moody's, the mark is not used in a manner such that "Horizons" would be readily perceived as identifying cooperative marketing and advertising services. The HTH brochure does not qualify as a specimen for the services identified in Class 35.

Under the Lanham Act, specimens must be submitted to receive a registration: "The

owner of a trademark used in commerce may request registration of its trademark on the

principal register hereby established by . . . filing in the Patent and Trademark Office an

application and a verified statement . . . and such number of specimens or facsimiles of the mark

as used as may be required by the Director." 15 U.S.C. § 1051(a)(1). The specimen

requirements of the Director are set forth in 37 C.F.R. §§ 2.56 and 2.88. Because the HTH

brochure does not qualify as a specimen, Allied did not submit a qualifying specimen for its

Class 35 services. Had the examiner known this, the registration would have been refused for

violation of 15 U.S.C. § 1051(a)(1). This establishes a second valid ground for cancellation.

The TTAB ruled similarly in In re Goldencare Corporation, 1998 WL 353727 (T.T.A.B.

1998). In that case, the insurance company applicant sought to register a mark for marketing

services to the insurance industry. The examiner refused registration because the specimens

submitted showed use of the mark only to identify insurance plans, rather than marketing of

insurance products for others, and the TTAB affirmed. See also In Cpc International Inc. v.

Skippy Inc., 1987 WL 124285 (T.T.A.B. 1987) (registration void ab initio because specimens did

not demonstrate use in commerce). In the instant case, because Allied falsely stated that the

HT50+ specimen was in actual use in commerce, the examiner did not refuse registration. Had

the truth been known, registration should have been refused.

In response, Allied argues that the "HORIZONS" mark was in actual use in commerce in

connection with the Class 35 services. (Def.'s Omni. Br. Opp. 27.) Yet Allied offers no

evidence whatever to support this factual assertion.[3] Allied thus fails to even show the existence

---

[3]Allied did point to evidence that it provided advertising and marketing services for the benefit of others (the underwriters of its insurance plans), but this is not evidence that it used the mark to identify those marketing and advertising services. It is not enough for Allied to show

13

of a genuine factual dispute over whether it had actually used the mark in commerce to identify and distinguish the Class 35 services.  The undisputed evidence before this Court on summary judgment shows that Allied has not used the "HORIZONS" mark in commerce as a mark for Class 35 services.  Thus, Allied's failure to submit a valid specimen of use for the Class 35 services is more than a mere technical violation of application requirements: rather, Allied has failed to show that it actually used the mark in commerce to identify and distinguish Class 35 services, a fundamental element of entitlement to registration under the Lanham Act.[4]  15 U.S.C. § 1051. Under the Lanham Act, Allied was not entitled to receive a registration for the Class 35 services.   Registration should have been refused had the truth about the specimen been known to the examiner.  This provides a second valid ground for cancellation of the registration.

     C.    Invalidity based on fraudulent procurement

HHS argues that Allied fraudulently procured its registration on the grounds that it: 1) fraudulently broadened the scope of services; 2) fraudulently submitted a specimen of use; 3) failed to disclose HHS' superior rights to the mark; 4) fraudulently represented that the mark would not be used in connection with life insurance; and 5) fraudulently represented that the marketing services were "for others."

Fraud in the procurement of a registration is a ground for cancellation. 15 U.S.C. §

---

that it provided the Class 35 services; to counter HHS' evidence, Allied must offer evidence that it used the mark to identify and distinguish those services, and it has not done so.  The Lanham Act does not merely require any kind of use in commerce; a service mark must be used "to identify and distinguish the services . . .  from the services of others and to indicate the source of the services."  15 U.S.C. § 1127.  This is a crucial distinction that Allied has overlooked.

    [4]See Marshall Field & Co. v. Mrs. Fields Cookies, 11 U.S.P.Q.2d 1355, 1358 (T.T.A.B. 1989) (observing the distinction between mere insufficiency of a specimen and failure to show trademark use in commerce).

14

1064(3).  "Fraud in procuring a [] mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application.  The obligation which the Lanham Act imposes on an applicant is that he will not make knowingly inaccurate or knowingly misleading statements in the verified declaration forming a part of the application for registration."  Metro Traffic Control v. Shadow Network, 104 F.3d 336, 340 (Fed. Cir. 1997). Proof of fraud thus requires proof of scienter, that the false statement was made knowingly. Marshak v. Treadwell, 240 F.3d 184, 196 (3d Cir. 2001).

Horizon argues for a less stringent standard, essentially a negligence standard for scienter: the applicant knew or should have known of the falsity of the statement.  In Marshak, the Third Circuit explained that actual knowledge is required, but, based on the facts and circumstances of certain cases, "proof that the applicant should have known [i]s ample to prove actual knowledge."  Id.  The Third Circuit's rule is in harmony with the guidance of the Federal Circuit: "Merely making a false statement is not sufficient to cancel a mark. Moreover, a party seeking cancellation for fraudulent procurement must prove the alleged fraud by clear and convincing evidence."  L.D. Kichler Co. v. Davoil, Inc., 192 F.3d 1349, 1351 (Fed. Cir. 1999) (internal citations omitted).

The Federal Circuit considers not only knowledge but also fraudulent intent in the scienter determination.  In Metro Traffic, the Court found no fraudulent intent or intent to deceive because the applicant's misstatements did not evidence a "conscious effort to obtain for his business a registration to which he knew it was not entitled."  Metro Traffic, 104 F.3d at 341. Fraudulent intent may be inferred from objective manifestations in the circumstances.  Medinol Ltd. v. Neuro Vasx, Inc., 67 U.S.P.Q.2d 1205 (T.T.A.B. 2003).

The assertions of fraud in the procurement of Allied's registration rest on disputed factual issues both as to the falsity of the statements and/or fraudulent intent.  The Federal Circuit has observed that the scienter inquiry generally turns on factual questions which make summary judgment inappropriate: "As a general rule, the factual question of intent is particularly unsuited to disposition on summary judgment."  Copelands' Enterprises, Inc. v. CNV, Inc., 945 F.2d 1563, 1567 (Fed. Cir. 1991).  HHS has not demonstrated the absence of factual issues as to fraudulent intent regarding any of its assertions of fraudulent procurement.  As such, these issues are not amenable to resolution by summary judgment.

Even the argument that appears to have the strongest support, regarding the false specimen, still relies on disputed issues of fraudulent intent.  Allied has not disputed that the "Horizons Fifty Plus" brochure, submitted as a specimen of use under Class 35, was not in use when submitted.  Allied has also not disputed HHS' assertion that David Ashley knew that the Horizons Fifty Plus program had failed years earlier when he attested to the brochure's current use.  The undisputed evidence thus shows that Allied's statement of use contained a statement known to be false by the President of Allied, who attested to its truth.  Even with this determination, however, this Court cannot conclude that Ashley did so with the necessary fraudulent intent, that he made a "conscious effort to obtain for his business a registration to which he knew it was not entitled."  Metro Traffic, 104 F.3d at 341.  Summary judgment on the issues of fraudulent procurement will be denied.

Moreover, even if there were no genuine issues as to material facts precluding summary judgment on fraudulent procurement, the decision to cancel Allied's registration on other grounds renders the issues of fraudulent procurement moot.

D.    Registration symbol misuse

HHS contends that, subsequent to registration, Allied has misused the registration symbol ® by using it to market life insurance plans and group insurance plans.  Allied admits that it did use the registration symbol in conjunction with insurance plans on its website, and that such use was not within the scope of its registration, but states that this was inadvertent, and that this has been rectified.  HHS argues that this constitutes fraud on the public.

Although there may be something to this line of argument, HHS has not demonstrated that it is entitled to judgment as a matter of law.  Crucially, it has not specified the basis in law for its claim that this is fraud sufficient for cancellation of Allied's registration.  HHS points to TMEP § 906.04, which states that "[i]mproper use of the federal registration symbol . . . that is deliberate and intends to deceive or mislead the public or the Office is fraud."  But the TMEP is not a statute, and the case law requires a violation of the Lanham Act to justify cancellation due to post-registration fraud.

HHS contends as well that Allied's continuing use of the registration symbol with group insurance plans constitutes misuse and thus fraud.  Allied's use of the registration symbol with group insurance plans does constitute registration symbol misuse.[5]  Wells Fargo & Co. v. Lundeen & Associates, 1991 WL 326580, *2 (T.T.A.B. 1991).  Assuming that Allied believed its registration to be valid, the registration symbol is only applicable to the services identified in the registration.  Insurance plans marketed to employers, for coverage of groups of employees, do

_____

[5]This also constitutes inequitable conduct toward both HHS and the public.  Had this Court not decided to direct cancellation of Allied's registration, it would have been against the principles of equity to assist Allied in enforcing its rights under this registration.  See Fox-Stanley Photo Products, Inc. v. Otaguro, 339 F. Supp. 1293 (D. Mass. 1972); Urecal Corp. v. Masters, 413 F. Supp. 873 (N.D. Ill. 1976).

not fall within the scope of this identification of services.  Insurance plans commonly identified as group plans do not fall within the scope of the registration, and application of the registration symbol to them is improper.  HHS has not, however, shown how such misuse is sufficient for a finding of fraud, nor argued that it entitles them to relief on any other legal theory.  As will be discussed, however, this Court finds that Allied's registration symbol misuse constitutes inequitable conduct which supports the decision to cancel the registration.

### E.    The fairness of cancellation

Cancellation of Allied's federal registration is justified as a matter of law.  It is also just as a matter of fairness and equity.  Allied's conduct in the process of registration of the mark, and in its subsequent use of the mark and the registration symbol, has been inequitable regarding both its business competitors and the purchasing public.  Fundamental to trademark law are the aims of preventing unfair competition in business and protecting consumers from deception.  5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (4th ed.) § 2:1 (hereinafter "McCarthy").  Allied has competed unfairly and deceived the public.

The uncontroverted evidence shows that Allied has repeatedly asserted entitlement to trademark rights to which it was not entitled.  First, Allied applied to register a service mark for group insurance plans and impermissibly changed the description of services to apply the mark to individual health plans, receiving a federal registration to which it was not entitled.  Second, in the registration process, it submitted to the PTO an invalid specimen of use, a false affidavit of use, and a specimen that failed to show actual use of the mark in commerce to identify and distinguish its Class 35 services.  As discussed above, these are not mere technical violations. Allied claimed that it actually had used the mark in commerce to identify and distinguish its

18

Class 35 services, but offered no evidence to support this.  This Court infers from the evidence

before it, and the absence of any evidence to the contrary, that Allied had not actually used the

mark in commerce to identify and distinguish its Class 35 services, and that it claimed trademark

rights to which it was not entitled.  Third, it has engaged in registration symbol misuse, falsely

telling the public that it owns trademark rights that it does not in fact have.  This Court takes

judicial notice of the fact that Allied continues this registration symbol misuse on its website to

this day.  FED. R. EVID. 201.  Given this inequitable conduct, cancellation of Allied's federal

registration is fair.

## III.     The Motion and Cross-Motion for Partial Summary Judgment on Priority

The parties dispute who has priority of ownership in the mark "HORIZON" or

"HORIZONS" and seek a determination of priority.  Because this Court has determined that

Allied's federal registration for "HORIZONS" is invalid and should be cancelled, Allied may not

base a claim of priority on it.

In the alternative, Allied argues that it has priority in the mark "HORIZONS" based on its

federal registration no. 2,084,836 for the "WELLNESS HORIZONS" mark.  Although Allied

asserted that this registration provides a statutory basis for priority in the "HORIZONS" mark, it

offered no legal basis for this argument in either the opposition or reply briefs, nor in the

supplemental letter brief on priority.  In the supplemental letter brief, Allied presented only two

argument fragments: 1) "the WELLNESS HORIZONS registration grants Allied similar if not

identical trademark rights in the mark 'HORIZONS;'" and 2) it notes that in the "WELLNESS

HORIZONS" mark, "the dominant, non-disclaimed term is HORIZONS."  Allied did not

develop these comments into complete legal arguments in the brief.  As presented in the brief,

these comments are insufficient to persuade this Court that Allied's registration for

"WELLNESS HORIZONS" creates rights of priority in the mark "HORIZONS."  Moreover, by

its failure to articulate this argument fully in the opening brief for its cross-motion, Allied's

arguments are deemed waived.  Reynolds v. Wagner, 128 F.3d 166, 178 (3d Cir. 1997) ("an

argument consisting of no more than a conclusory assertion. . .  will be deemed waived"); Bayer

AG & Bayer Corp. v. Schein Pharm., 129 F. Supp. 2d 705, 716 (D.N.J. 2001) (striking

arguments not made in an opening brief).

 Even if this Court were to consider the arguments Allied presented at oral argument, they

would still not persuade that priority in one mark may derive from registration of a different

mark.  Allied first tried to gain some ground by observing that it had disclaimed "WELLNESS"

in the registration.  It ended up conceding, however, that the only legal significance of this

disclaimer was to renounce any rights in the word "WELLNESS" alone – the disclaimer did

nothing to create rights in the mark "HORIZONS."

 Scholars and courts have taken a position contrary to Allied's: registration of a composite

mark like "WELLNESS HORIZONS" creates rights in the whole mark only, not in any

component part.  See In re Nat'l Data Corp., 753 F.2d 1056, 1059 (Fed. Cir. 1985) ("The

registration affords prima facie rights in the mark as a whole, not in any component") ; Estate of

P. D. Beckwith, Inc. v. Commissioner of Patents, 252 U.S. 538, 545-546 (1920) ("The

commercial impression of a trade-mark is derived from it as a whole, not from its elements

separated and considered in detail"); Dranoff-Perlstein Assoc. v. Sklar, 967 F.2d 852, 861 (3d

Cir. 1992); In re Bose Corp., 772 F.2d 866, 873 (Fed. Cir.1985) ("Bose's rights in the

protectability of its registered mark rest on the distinctiveness of the entirety of that design, not

individual features thereof"); MᴄCᴀʀᴛʜʏ § 19:63 (by a disclaimer, "the applicant is merely

stating that he is claiming only the whole composite mark as his property, and makes no claim to

those particular portions disclaimed").  Far from helping Allied derive rights to "HORIZONS,"

the law of disclaimer supports the conclusion that Allied's  "WELLNESS HORIZONS"

registration does not give Allied any rights in the "HORIZONS" component of its composite

mark.

     At oral argument, Allied attempted to argue that its "WELLNESS HORIZONS"

registration gave it priority in the "HORIZONS" mark because of likelihood of confusion.

Setting aside the fact that Allied waived this argument by not mentioning it in its briefs,[6] this

approach fails because of a fundamental problem: it is an argument for infringement, not for

priority.  Under 15 U.S.C. § 1114(1)(a), any person who uses a mark in commerce in a way likely

to cause confusion is liable to the registrant for infringement.  Under this provision, Allied, as

owner of the "WELLNESS HORIZONS" registration, might bring an action for infringement

against HHS based on likelihood of confusion stemming from HHS' use of the "HORIZON"

mark.  Allied has not, however, moved for summary judgment on infringement.  As such,

arguments directed toward infringement and likelihood of confusion are not properly before this

Court, as the motion and cross-motion concern only priority.

     Allied may not rely on either federal registration to establish priority in the "HORIZONS"

mark.  Between Allied and HHS, the common law rules of ownership determine who has

superior rights to the mark.  In the Third Circuit, ownership of an unregistered mark must be

---

    [6]At oral argument, Allied admitted both that it had not briefed the likelihood of confusion
issue (Dec. 16, 2005 Hearing Tr. 31) and that the issue was not part of the motion and cross-
motion for summary judgment.  (Dec. 16, 2005 Hearing Tr. 23.)

based on actual and continuous commercial use.  "With respect to ownership of unregistered

marks, the first party to adopt a trademark can assert ownership rights, provided it continuously

uses it in commerce."  Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 292 (3d

Cir. 1991); Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d

Cir. 2000).

     Allied argues that the Third Circuit test for priority of common law rights in a mark is the

Natural Footwear market penetration analysis.  Natural Footwear, Ltd. v. Hart, Schaffner &

Marx, 760 F.2d 1383, 1398-1399 (3d Cir. 1985).  In Lucent Info. Mgmt. v. Lucent Techs., Inc.,

186 F.3d 311, 316 (3d Cir. 1999), the Third Circuit looked to the Natural Footwear market

penetration test to determine whether a party claiming prior rights in a common law mark had use

sufficient to entitle it to rights in the mark.  The Court determined that it did not need to perform

the full Natural Footwear analysis because the earlier use was de minimis and insufficient to

establish common law trademark rights.  Id. at 317.  Similarly, in the present case, this Court

need not perform a full Natural Footwear analysis to determine that HHS has priority: Allied has

failed to present evidence that would allow this Court to find any use in the five state area prior

to HHS' first use.

     Allied makes no claim of use in New York, New Jersey, and Pennsylvania prior to

September of 1998, when HHS began use in the five state area.  HHS has priority and superior

rights to the "HORIZON" mark in these three states.  Allied claims that it began actual use of

"HORIZONS" in Pennsylvania and Delaware in July of 1998 and has priority in those states

based on this earlier use.  Yet Allied offered no evidence whatever to support this claim.  To

support its claim, it pointed to a single chart, a demonstrative exhibit.  (Haefner Cert. Ex. C; Dec.

16, 2005 Hearing Tr. 47.)  This does not constitute admissible evidence and is, rather, only an ambiguous document that gives a mere suggestion of use.[7]   Allied admitted at oral argument that it had put nothing else before the Court to support its claim of earlier use.  Further, Allied does not dispute that HHS began use in September of 1998.  As such, Allied has failed to bring forth evidence that shows the existence of a genuine issue as to the material fact of which party used the mark first in Delaware and Pennsylvania.  The uncontroverted evidence before this Court demonstrates that HHS began actual use of the mark first in Delaware and Pennsylvania.  HHS has rights of priority in the "HORIZON" mark in all five states.  Summary judgment on priority will be granted in HHS' favor.

---

[7]Titled "Timeline for Horizons Trademarks," the exhibit gives a list of dates and products.  For each date and product, there is a list of abbreviated state names.  The exhibit does not state what the association is between the state, the date, and the product: it does not, for example, state that the product was actually used in commerce in that state on that date.

## **CONCLUSION**

For the foregoing reasons, this Court grants in part HHS' motion for summary judgment on the issue of the invalidity of Allied's federal service mark registration no. 2,724,437, due to application defects.  HHS' application for cancellation of this mark is granted; this Court directs cancellation of service mark registration no. 2,724,437.  This Court denies in part HHS' motion for summary judgment on all other issues of validity of the registration.  This Court grants HHS' motion for summary judgment on the issue of priority and finds that HHS has priority in the mark "HORIZON" in New York, New Jersey, Connecticut, Delaware, and Pennsylvania. Allied's cross-motion for summary judgment on priority is denied.


                                              S/Joseph A. Greenaway, Jr.
                                              JOSEPH A. GREENAWAY, JR., U.S.D.J.


Dated: February 10, 2006